**Edward CHOSNEK, as Receiver for the Estate of Steven Whaley, Teddi Whaley, P & M Price Data, Inc., and Commodity Management Plus, and Donald E. Funk, Appellants–Plaintiffs,**

v.

**Ronald T. ROLLEY, Josette Rolley, Jocelyn Rolley, Daryl Rolley, and Larissa Rolley, Appellees–Defendants.**

No. 79A02–9612–CV–764.

Court of Appeals of Indiana.

Nov. 19, 1997.

Seth D. Linfield, George E. Horn, Jr., Barnes & Thornburg, South Bend, for Appellants–Plaintiffs.

Roger Wm. Bennett, Christine A. DeSanctis, Andrew S. Gutwein, Bennett, Boehning & Clary, Lafayette, for Appellees–Defendants.

**OPINION**

FRIEDLANDER, Judge.

A Ponzi scheme is a type of fraud involving a series of investors in which the resources of the later investors are used to fund obligations to the earlier investors, resulting in a pyramiding of the liabilities of the investment enterprise. This action essentially involves a dispute between two victims of such a scheme. The entities and individuals to which the investments were entrusted were Steven Whaley and his wife Teddi Whaley, P & M Price Data, Inc. (P & M) and Commodity Management Plus, Inc., (CMP) (unless otherwise specified, we will henceforth refer to CMP, P & M, Steven Whaley, and Teddi Whaley as "the Whaley Entities"). Donald E. Funk, one of the appellants in this action, was a later investor. The other appellant, Edward Chosnek (also referred to herein as the Receiver), was the receiver appointed by the court to marshal the assets of the Whaley Entities for the purpose of distributing the remainder to creditors after paying the costs of administrating the receivership. The appellees, Ronald, Josette, Jocelyn, Daryl, and Larissa Rolley (the Rolleys), were earlier investors. The lawsuit filed by Chosnek and Funk was an effort by those parties to recover moneys in the hands of the Rolleys which

allegedly came from Funk's investment. The appellants appeal a grant of summary judgment in favor of the appellees, presenting as the sole issue for review the correctness of that ruling. That issue, in turn, presents the following questions:

1. Did Chosnek have standing to file suit on behalf of Funk?

2. Was the trial court correct in granting summary judgment in favor of the Rolleys on the theory of election of remedies?

3. Is the appellants' suit barred by the doctrine of collateral estoppel?

4. Did the trial court err in concluding that money paid to a pension fund did not constitute payment to the Rolleys?

5. Did the trial court err in concluding that the Rolleys should not be compelled to return the money paid to them by the Whaley Entities?

6. Did the trial court erroneously base summary judgment upon defenses which it had previously forbidden the Rolleys from asserting?

We affirm.

The facts favorable to the nonmoving parties are as follows. In 1986, Steven Whaley and Vernon Everton formed CMP and P & M for the purpose of trading commodities. By November, 1986, the Rolleys had invested $610,267.94 with the Whaley Entities. Sometime in 1986, Steven Whaley began siphoning money from CMP and P & M for his personal use. During this time, the Rolleys received periodic account statements that reflected substantial gains from their investments. The Rolleys were unaware that the account statements were false.

By July 1987, the total balance of CMP's and P & M's accounts had dropped to between a negative and positive $20,000. Before then, the Whaley Entities had distributed to the Rolleys a total of $87,500. On July 23, 1987, Funk made his initial investment with the Whaley Entities in the amount of $250,000. Between July 1987 and March 1988, Funk delivered a total of $3,170,199.18 to invest in the commodities market. This amount represented 55% of the total funds invested with the Whaley Entities during that period of time. Also between July 1987 and March 1988, the Whaley Entities distributed funds totaling $701,286.82 to various accounts associated with the Rolleys, including a pension fund for which Ronald Rolley served as trustee. Nevertheless, the Rolleys suffered a net loss from their investments with the Whaley Entities.[1]

On April 19, 1988, Everton filed suit against the Whaley Entities, seeking an accounting, damages, and the appointment of a receiver. Chosnek was appointed receiver of the Whaley Entities. Chosnek's mandate on behalf of the damaged investors was to marshal the assets of the Whaley Entities and assist in providing an accounting of all funds received and disbursed by the receivership defendants. Funk filed a claim against the Whaley Entities for $3,170,199.18. Jocelyn, Daryl, and Larissa Rolley also filed claims, but Ronald and Josette did not. On June 12, 1992, the Whaley Entities entered into an Agreed Judgment with the Receiver for $4,072,328.38, an amount representing the total of all claims filed with the Receiver against the Whaley Entities. The receivership court found that the Receiver had collected all non-exempt assets of the Whaley Entities and the court authorized a proportional distribution of those assets among the creditors. Funk received $158,945.30, while Jocelyn, Daryl, and Larissa received a combined total of $7,712.12.

On July 22, 1993, the Receiver and Funk filed a complaint for unjust enrichment and constructive trust against numerous individuals, including the Rolleys, all of whom had invested funds with the Whaley Entities. The complaint alleged that each of the named defendants had invested money with the Whaley Entities and had received a return on their investment. The complaint further alleged that "some or all of the monies the defendants received had been transferred

---

1. $117,086.82 of the $701,286.82 was distributed to the aforementioned pension fund, which is a separate legal entity and not a party to this action. As will be discussed in Issue 4, *supra*, the payment to the pension fund did not constitute a payment to the Rolleys and is not recoverable in this action.

from the Funk Account with CMP." *Record* at 67.

On July 14, 1995, the Rolleys filed a motion for summary judgment on the following theories: (1) Election of remedies- by opting to participate in the receivership action and by pursuing that remedy to its conclusion and collecting an award, Funk was foreclosed from pursuing the Rolleys on a different theory; (2) standing- the Receiver lacked standing to pursue Funk's property; (3) collateral estoppel- by participating in the receivership action, which culminated in a settlement and an order stating that the Receiver had "fully pursued and collected all non-exempt assets of Defendants", *Record* at 207, the Receiver was estopped from alleging the existence of additional, non-exempt assets; and (4) failure to receive permission from the receivership court to pursue Funk's complaint. On August 8, 1995, the appellants filed a motion for summary judgment and the Rolleys thereafter responded with their own summary judgment motion.

On August 7, 1996, the trial court granted the Rolleys' motion for summary judgment, issuing the following conclusions of law:

2. Whaley Entities operated a "Ponzi Scheme", which scheme began at the time the first investor invested in Whaley Entities scheme and Whaley Entities began siphoning off funds from the investors;

3. Funk has the burden to prove that the Rolley defendants either profited by the scheme of Whaley Entities or that they were a party to that scheme;

4. Funk has failed in his burden of proof as to his claims herein;

5. The Rolley defendants did not profit by their deposits or withdrawals with Whaley Entities;

6. The Rolley defendants suffered a pecuniary loss by reason of their deposits and withdrawals with Whaley Entities;

7. The Rolley defendants received monies from Whaley Entities, but Funk has failed to prove that said monies were received at the detriment of Funk, and has failed to prove the Rolley defendants had and received monies from Whaley Entities belonging to Funk;

8. The Rolley defendants received monies from Whaley Entities, but the same were less than the monies they had deposited in Whaley Entities;

9. The Rolley Trust is a separate and distinct legal entity from the Rolley defendants, and is not a party to this lawsuit, and the $117,086.82 received by said Trust from Whaley Entities and deposited by said Trust in its account was not received by the Rolley defendants and is excluded from this proceeding as a matter of law;

10. If Funk claims that the Rolley Trust is not a separate legal entity and that the receipt of said monies by the Trust was in effect the receipt of monies by the Rolley defendants, he has failed to prove said claim herein;

11. Funk claims as a matter of law that inasmuch as some of the monies deposited by the Rolley defendants were invested in the commodities market by Whaley Entities, the Rolley defendants received what they had bargained for, and that fact alone altered [the] character of the scheme employed by Whaley Entities from that of a Ponzi Scheme so far as it related to the Rolley defendants, but there are no facts nor law giving merit to such claim, and the law is against Funk as to said claim;

12. Funk has failed to prove a constructive trust existed in law or fact in favor of Funk as to any monies received by the Rolley defendants from Whaley Entities;

13. The Motion for Summary Judgment of the Rolley defendants should be sustained and the Motion for Summary Judgment of Funk should be denied.

*Record* at 1539–40. This appeal ensued.

We note that the trial court entered findings of fact and conclusions of law. Although findings and conclusions aid appellate review, they are not binding on this court. *Yater v. Coy,* 681 N.E.2d 232 (Ind.Ct.App. 1997). Our task when reviewing a summary judgment ruling is well settled.

As a reviewing court, we are bound by the same standard as the trial court. The standard is that summary judgment is

warranted only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Just as the trial court, we may only consider those parts of the pleading, depositions, answers to interrogatories, admissions, matters of judicial notice, and other matters which have been designated by the parties to the trial court for consideration. "Any doubt about the existence of fact or the inference to be drawn from it is to be resolved in favor of the non-moving party."

*Webb v. Jarvis,* 575 N.E.2d 992, 994 (Ind. 1991) (citations omitted).

The gist of the appellants' argument before the trial court, and as well before this court on appeal, was that the Rolleys lost the money they invested through misappropriation on Whaley's part, and that the returns they received were actually funds taken from Funk's account with CMP. The appellants seek the return of money paid to the Rolleys by the Whaley Entities.

### 1.

We address first the question of whether Chosnek, as receiver, had standing to bring suit on Funk's behalf.

 Standing is a judicial doctrine that focuses on whether the complaining party is a proper party to invoke the court's jurisdiction. *Shourek v. Stirling,* 621 N.E.2d 1107 (Ind.1993). The standing doctrine is designed to assure that litigants actively and vigorously pursue their claims, *Holiday v. Kinslow,* 659 N.E.2d 647 (Ind.Ct.App.1995), and to prevent the filing of meritless and frivolous lawsuits. *Reinking v. Metropolitan Bd. of Zoning Appeals of Marion County,* 671 N.E.2d 137 (Ind.Ct.App.1996). In order to have standing, a plaintiff must demonstrate a personal stake in the outcome of a lawsuit and must show that he or she has sustained or was in immediate danger of sustaining some direct injury as a result of the conduct at issue. *Shourek,* 621 N.E.2d 1107.

 In the instant case, the Receiver filed an application for an order authorizing pay-

ment of fees and expenses associated with administration of the receivership, and for distribution of the balance of the proceeds to pay claims. Nevertheless, the Receiver has not filed a final report to date and has not been discharged. Therefore, as of the date of oral argument before this court,[2] the receivership remained open.

Chosnek and Funk's complaint alleges that the Rolleys are in possession of assets that belong to the Whaley Entities, and the complaint may be interpreted as seeking primarily the return of Funk's money to Funk. If such were the case, it is doubtful that the Receiver would have standing to participate because the receivership entity would have no stake in the outcome. However, the complaint seeks, *inter alia,* the "return of all monies proven at trial to have been received improperly by the defendants and [an] order that such funds be properly distributed as directed by [the] Court." *Record* at 71. We interpret the above paragraph of the complaint to be a request for return of the money and for an order distributing the recovered funds consistent with the scheme set out in the application for partial accounting. In other words, the Receiver seeks to recover further assets of the receivership entity and requests a distribution among the creditors of the entity. We conclude that this view represents the correct posture and interests of the parties in this action. As such, the Receiver had standing to file this lawsuit. *See Scholes v. Ames,* 850 F.Supp. 707 (N.D.Ill.1994).

### 2.

We next address the issue of whether the appellants' action was barred by the doctrine of election of remedies.

 The election of remedies doctrine is equitable in origin. *Farmers State Bank of Wyatt v. Clark Equip. Co.,* 582 N.E.2d 452 (Ind.Ct.App.1991). The doctrine applies where a party who has two co-existing but inconsistent remedies elects to pursue one to its conclusion and not sue on the other. *Hoover v. Hearth & Home Design Center, Inc.,* 654 N.E.2d 744 (Ind.1995).

**2.** Oral argument was conducted in Indianapolis on September 8, 1997.

We do not agree that the doctrine of election of remedies is applicable here. The doctrine applies only when the two actions in question are inconsistent with one another. *Id.* By their complaint for damages, Chosnek and Funk sought the return of assets of the receivership entities that were improperly paid to the Rolleys. Therefore, the instant action emanates from and is entirely consistent with the receivership action.[3] In both, the Receiver sought recovery of receivership assets for the purpose of distributing the assets to creditors of the entities as directed by the court. The appellants were not entitled to summary judgment on the theory of election of remedies.

### 3.

The Rolleys seek to invoke the doctrine of defensive collateral estoppel. They argue that because the Receiver alleged in the request for accounting and distribution of assets that "the Receiver [had] fully pursued and collected all non-exempt assets of [the Whaley Entities]", *Record* at 207, they were estopped from later seeking recovery of funds alleged to be additional assets of the Whaley Entities.

Because a final accounting had not been made as of the date of oral argument before this court, the receivership remains open, and the court was free to consider and approve other requests by the Receiver that were consistent with the receiver's duties. Therefore, the doctrine of collateral estoppel does not apply. Having determined that the Rolleys were not entitled to summary judgment on procedural grounds, we now address the merits of the decision that the Rolleys were entitled to judgment as a matter of law.

### 4.

Because it is pertinent to the ultimate issue, *i.e.*, summary judgment in favor of the Rolleys, we address the Receiver's contention that the trial court erred in concluding that a trust fund established by the Rolleys (1) is a separate and distinct legal entity from the Rolley defendants, (2) was not a party to the lawsuit, and (3) was excluded from the proceeding as a matter of law.

Ronald Rolley managed all of the Rolley assets at issue. Although the record does not reflect when it occurred, at some point in time Ronald Rolley opened a separate account with P & M for a Defined Benefit Pension Plan and Trust Agreement (the Pension Plan), a plan he had established for his employees. Ronald Rolley was the trustee of the Pension Plan. By January 27, 1988, the Pension Plan account with P & M showed a balance of $117,086.82 and, by that time, employees unrelated to the Rolleys had a vested interest in the plan. On that day, the Whaleys issued a cashier's check made out to "Ronald Rolley" for $117,086.82 against the P & M Pension Plan account. Ronald Rolley immediately endorsed the check over to the Pension Plan's account at Bank One.

The Receiver contends that because the cashier's check was made payable to "Ronald Rolley", the payment actually was made to the Rolleys, not the Pension Plan. The identity of the entity receiving the payment is important because the Receiver did not name the Pension Plan as a defendant in this action. Therefore, if the money went to the Pension Plan, and not the Rolleys, it was not properly before the court in this action because the Pension Plan had not been named as a party defendant.

Although the check was made out to Ronald Rolley individually, it was undisputed that the amount on the check represented the precise amount of the balance of a P & M account set up in the name of the Pension Plan, and that the account was emptied as a result of the withdrawal. It was also undisputed that the check was endorsed by Ronald Rolley, who was trustee of the Pension Plan, and placed into an existing Bank One account that had been opened in the name of the Pension Plan. Inasmuch as the Pension

---

3. We note as a preliminary matter that a complaint filed by a receiver must demonstrate that leave of court to institute and prosecute the action has been obtained. Ind.Code Ann. § 34–1–12–7 (West 1983); *Spinney v. Hall,* 49 Ind.App. 502, 97 N.E. 571 (1912). The complaint in the instant case contained no such allegation. However, we deem it to be in the best interest of judicial economy to consider the viability of the complaint from a substantive, as opposed to procedural, perspective.

Plan was a separate legal entity, the money came from a Pension Plan account, the check was made out to the person who served as trustee of the Pension Plan, and the money was placed into a bank account established in the name of the Pension Plan, we conclude that the $117,086.82 payment was made to the Pension Plan and not the Rolleys. Because the Pension Plan was not a party in this action, the trial court did not err in concluding that said money was not a proper subject for adjudication in the instant case.

### 5.

The court determined that the Rolleys were entitled to keep the money they had received from the Whaley Entities. As reflected in the conclusions of law reproduced previously, that determination was premised upon the following conclusions: 1) Whaley operated a Ponzi scheme; 2) the Rolleys received money from the Whaley Entities but suffered a net loss on their investment; 3) the monies paid to the Rolleys did not belong to Funk; 4) the Rolley Trust was a legal entity separate from the Rolleys and was entitled to summary judgment because it was not named in the appellants' complaint.

Whaley contends that the trial court erred in determining that Whaley operated the Ponzi scheme before Funk began making investments in July 1987. This conclusion is significant to the appellants' case because, according to their argument, recovery of the disputed money was contingent at least in part upon proving that the Rolleys' money had already been lost through investment when Funk's money was placed in the corporation and that the money subsequently given to the Rolleys came directly from Funk.

■ As stated previously, a Ponzi scheme refers to a type of fraud that involves a series of investors, in which the resources of later investors are used, not for the stated purpose, but rather to fund obligations to earlier investors. *See United States v. Boula,* 932 F.2d 651 (7th Cir.1991). All parties concede that Steven Whaley was operating a Ponzi scheme, at the latest, when Funk began investing money in the Whaley Entities. By that time, the appellants contend, the money previously given to the Whaley Enti-

ties for purposes of investment had been lost in the market through failed investments.

The appellants' contention that the Ponzi scheme did not commence until Funk invested money in the Whaley Entities was premised upon alternative factual assertions. First, the appellants contended that all of the Rolleys' money was lost through failed investments prior to the time that Funk invested money in the company. Therefore, the argument goes, the payments made to the Rolleys after that time were made from Funk's money and were unrelated to investments made with the Rolleys' money. Second, the appellants contend that even if the Rolleys' money was gone as a result of fraud on Steven Whaley's part, there was no Ponzi scheme because the Rolleys' money was not used to pay previous investors.

■ Examining the case law set out above, we find no authority for the appellants' assertion that a Ponzi scheme starts only after the first payment of money from later investors was paid to earlier investors. The cases to which the appellants allude in support of this principle involve Ponzi schemes, but do not shed any light on the question of when one begins. To answer this question, we return to the definition of a Ponzi scheme itself.

A Ponzi scheme contemplates a series of transactions. *Boula,* 932 F.2d 651. The necessity of misappropriating money from later investors in order to pay earlier ones arises precisely because the accused defrauded the earlier investors in the first place. If the money of the earlier investors had been used as intended, there would be no need to divert money from later investors in order to deceive the earlier investors about the fate of their investments.

Steven Whaley admitted in his criminal action that he had engaged in a fraudulent scheme when he accepted $1,000,199.18 from Funk in January of 1988 "by false or fraudulent pretenses, representations or promises". *Record* at 1284. By that time, the misappropriation of Funk's funds was necessitated at least in part because Whaley intended to continue deceiving the Rolleys into believing that their investments were safe. We conclude therefore that the Ponzi scheme in-

volved the Rolleys' funds as well as Funk's. Therefore, the question of whether the Rolleys are required to return to the receivership money received from the Whaley Entities must be determined by resort to Ponzi scheme law.

The Receiver contends that the Rolleys' money must be returned to the receivership on the theory that the money was diverted directly from funds invested by Funk. This contention highlights a pivotal question before this court in the instant case: assuming that both Funk and the Rolleys were innocent victims of the Ponzi scheme operated by Whaley, must the Rolleys surrender money paid to them by the Whaley Entities ostensibly as returns on their investments? The Receiver advanced five theories in support of his claim that the money should be returned. Those theories are: (1) Count I-unjust enrichment; (2) Count II—constructive trust; (3) Count III—money had and received; (4) Count IV—resulting trust; and (5) Count V—Fraudulent Conveyance.

### A. Unjust Enrichment

Regardless of the theory under which the claim is advanced, and assuming that both Funk and the Rolleys were victims of the same Ponzi scheme, both sides appear to agree that recovery depends in large part upon a determination of whether the Rolleys profited by their investment. Restatement of Restitution § 13 (1937) states:

> A person who has entered into a transaction with another under such circumstances that, because of a mistake, he would be entitled to restitution from the other,
>
> > (a) is not entitled to restitution from a third person who has received title to or a legal interest in the subject matter either from the other or from the transferor at the direction of the other, and has given value therefor without notice of the circumstances[.]

No Indiana case has applied § 13 in this context. However, we agree with the holding and supporting rationale on this and other related issues in a similar case, *Scholes v. Ames*, 850 F.Supp. 707 (N.D.Ill.1994), which incorporated and applied the principles un-derlying § 13, although the district court did not refer to the Restatement provision itself.

The *Scholes* court concluded that a later investor may not recover from an earlier investor if the earlier investor gave value for the return without notice of the circumstances. Although the court did not mention § 13, its holding clearly implemented the principles contained therein. The *Scholes* court then impliedly concluded that, for purposes of determining whether a later investor may recover money paid to an earlier investor, a Ponzi scheme victim has given value for any funds received from the fraudulent corporation to the extent of the amount of principal originally invested:

> At the same time, the defendants were innocent investors who accepted their payments as legitimate returns on their investments. Plaintiff has made no allegation that the defendants committed fraud or participated in the Ponzi scheme.... The evidence therefore supports the proposition that the defendants received these conveyances in good faith and justifiably relied on the benefits of the conveyances.... Whether the later investors have a claim against the prior investors who received more than their investments need not be decided here because those investors are not before the court. However, in this case, the Receiver, on behalf of [the operator of the Ponzi scheme] and the receivership entities, hopes to recover from the defendants those payments that the Ponzi scheme depended upon in order to continue and that the defendants took in good faith and personally relied upon. The Receiver has not shown that this scenario unequivocally represents unjust enrichment as expressed by Illinois courts.

*Id.* at 712.

■■■ We agree with the *Scholes* court's reasoning and hold, that, in Indiana, pursuant to § 13 of the Restatement of Restitution, an innocent investor in a Ponzi scheme is *not* unjustly enriched when he receives returns on his investment in good faith and while ignorant of the scheme, so long as the returns do not exceed the amount of the original investment. To the extent of the original investment, such are not subject to

claims made by later investors on the theory of unjust enrichment. *Id.*[4] The trial court did not err in granting summary judgment against the Receiver on the theory of unjust enrichment.

### B. Constructive Trust

The second count of the complaint sought the establishment of a constructive trust.

 A constructive trust is a creature of equity, devised to do justice, regardless of the parties' intentions. *Criss v. Bitzegaio,* 420 N.E.2d 1221 (Ind.1981). It is more in the nature of an equitable remedy than an independent cause of action. *See Scholes v. Ames,* 850 F.Supp. 707. We agree with the *Scholes* court that in this context, absent unjust enrichment, a constructive trust is not appropriate. Having decided that the Rolleys were not unjustly enriched when they recouped an amount not exceeding the amount originally paid into the corporation, the Rolleys were entitled to summary judgment on the question of a constructive trust.

### C. Resulting Trust

 A resulting trust is defined by the Restatement of Trusts as follows:

A resulting trust arises where a person makes or causes to be made a disposition of property under circumstances which raise an inference that he does not intend that the person taking or holding the property should have the beneficial interest therein, unless the inference is rebutted or the beneficial interest is otherwise effectively disposed of.

Restatement (Second) of Trusts § 404 (1959). A resulting trust, like a constructive trust, is an equitable remedy. *Criss v. Bitzegaio,* 420 N.E.2d 1221; *Estate of Hann v. Hann,* 614 N.E.2d 973 (Ind.Ct.App.1993). It is an implied trust and arises by implication of law, based upon the presumed intention of the parties. *Estate of Hann v. Hann,* 614 N.E.2d 973.

 For purposes of the Receiver's claim for recovering the money paid to the Rolleys, we perceive no meaningful distinction between a constructive trust and a resulting trust. As is true with a constructive trust, absent unjust enrichment on the Rolleys' part, a resulting trust does not arise by operation of law on the facts of this case. *Scholes v. Ames,* 850 F.Supp. 707; *see also* Restatement (Second) of Trusts § 408 ("[i]f the trustee of a resulting trust in breach of trust transfers trust property to a bona fide purchaser, the transferee takes the property free of the resulting trust").

### D. Money Had and Received

 Under Count III, the Receiver claimed that the money should be returned on the theory of money had and received.

This court has set out the following rule governing actions for money had and received:

[A]n action for money had and received is an equitable remedy that lies in favor of one person against another, when that other person has received money either from the plaintiff himself or third persons, under such circumstances that in equity and good conscience he ought not to retain the same, and which money, *ex aequo et bono,* belongs to the plaintiff, and where money has been received by mistake of facts, or *without consideration,* or upon a consideration that has failed, it may be recovered back. Such an action rests upon an implied promise and may be maintained against the person who received money from the plaintiff under circumstances which in equity and good conscience he should not retain.

*Huff v. Biomet, Inc.,* 654 N.E.2d 830, 837 (Ind.Ct.App.1995) (emphasis in original) (quoting *Pufahl v. National Bank of Logans-*

---

**4.** Without citation of authority or to the record, appellants make the argumentative contentions that "The Rolley defendants got what they bargained for—a chance to play the commodities market.... After losing their money in the market, the Rolleys were reimbursed with Funk's money." Appellant's Brief at 23. These naked allegations do not constitute an argument that even in the event that the Rolleys are entitled to retain a portion of the funds, such does not include that amount which was actually lost through legitimate participation in the market. Accordingly, this issue is not before us and need not be decided today.

*port,* 129 Ind.App. 191, 154 N.E.2d 119, 120–21 (1958)). We have decided that the Rolleys gave consideration for the returns they received from the Whaley Enterprises in the form of the principal paid. The presence of such consideration defeats a claim premised upon the theory of money had and received.

### E. Fraudulent Conveyance

■ Under Count V, the Receiver sought recovery of the money on the theory of fraudulent conveyance.

The *Scholes* court rejected the argument made by the receiver in that case that the receivership was entitled to recover funds paid to prior Ponzi scheme investors on the theory of fraudulent conveyance. The court concluded that recovery under that theory was not warranted if the prior investor gave consideration for the apparent return on his investment. Although discussing an additional issue not relevant in the instant case, *i.e.,* whether a receivership may recover money paid in excess of the amount of the original investment, the following excerpt details the court's views on the issue, and we approve and adopt the court's rationale in the instant case:

> The *[Johnson v. Studholme,* 619 F.Supp. 1347 (D.Colo.1985) ] court then determined that the investors gave value for the profits they received and, thus, did not receive fraudulent conveyances. The court held that the capital contributions made by the investors and the risk that they could lose all or part of their investments was their contributions.

The same reasoning applies in this case to the principal investments made by the defendants. We decline, however, to follow such reasoning as to the purported profits. The defendants here were good faith investors. Through their investments, the defendants entered into a contractual relationship with the limited partnerships. In doing so, they gave cash to the investment partnerships and took a risk that the investment would be lost. They subsequently received their payments with nothing less than a good faith belief that it was a legitimate return on their investments. As such, defendants gave equivalent value for the principal investment returned to them by Douglas. *Scholes v. Ames,* 850 F.Supp. at 715. The court then concluded that only the amounts the prior investors received *in excess* of their investments constituted fraudulent conveyances subject to the claims of the receivership. We agree with the *Scholes* court's analysis and conclude that the trial court did not err in granting summary judgment in favor of the Rolleys on this issue.

In summary, we conclude that the Receiver is not entitled to recover the money paid to the Rolleys under any of the theories advanced in its complaint. Therefore, the trial court did not err in granting summary judgment in favor of the Rolleys.

### 6.

■ Funk contends that the trial court erred in granting summary judgment upon defenses asserted by the Rolleys, because the court had previously ruled the Rolleys would be precluded from presenting those defenses.

On March 26, 1996, the trial court granted Funk's motion to, *inter alia,* preclude the introduction of certain evidence, upon its determination that the Rolleys had "repeatedly and willfully failed to properly respond to discovery requests". *Record* at 591. The court's order included the following:

> 2. The Rolley defendants are precluded from presenting any defenses at the trial of this cause, other than the preclusion arising out of the trustee proceeding for the failure of said defendants to properly respond to Interrogatory # 3 [5] of the June 30, 1995, Interrogatories.
>
> a) describe the exact nature of the defense; and
> b) explain in detail the facts supporting the defense; and
> c) describe how the defense lessens the damages and what damages defendants concede even under the defense; and

---

**5.** The interrogatory in question states:

> 3. For any defense ... which the defendants, the Rolleys, intend to assert to lessen the damages claimed against him [sic] by the plaintiff, Funk, such damages calculated to be $579,086.82 plus prejudgment interest,

*Record* at 591 (footnote supplied). The receiver contends that the court rendered summary judgment in favor of the Rolleys on the bases of two defenses that the above order precluded, *i.e.,* the "pension fund and Ponzi scheme defenses". Appellant's Brief at 31.

We agree with the Rolleys' assertion that the trial court's order cannot be understood to preclude the Rolleys from presenting *all* defenses. Such would have been tantamount to rendering default judgment in favor of the receivership. The court could not have intended such a result, however, because elsewhere in the same order the court explicitly denied the receivership's motion for default judgment against the Rolleys. Moreover, the court subsequently granted summary judgment in favor of the Rolleys based upon these defenses. We presume the court was aware of the meaning of and limitations imposed by its March 26 order when it rendered summary judgment.

Reading the two orders together, and in view of the court's ultimate ruling in favor of the Rolleys, we cannot agree that the court's March 26 order was meant to foreclose the presentation of *all* defenses. We acknowledge that the defenses to which paragraph 2 alludes are not clear. However, for purposes of the issue before us, we need not decide more than that the order did not preclude the defenses upon which the court based its order.

In summary, we conclude that the trial court did not err in granting summary judgment in favor of the Rolleys.

Judgment affirmed.

SULLIVAN and RUCKER, JJ., concur.

d) identify all documents and communications which concern any portion of your response to this interrogatory; and
e) identify all persons with knowledge of any portion of your response to this interrogatory and specify the facts with which each person has knowledge.
*Record* at 511.