**In re the ESTATE OF Ronald Earl JONES, Deceased.**

No. A12–0828.

Court of Appeals of Minnesota.

Dec. 24, 2012.

Review Denied March 19, 2013.

William G. Peterson, Peterson Law Office, LLC, Bloomington, MN, for appellants Ronald H. Jones, Jessica Warren.

William A. Erhart, Erhart Legal, L.L.C., Anoka, MN, for respondent Charlotte Larson.

Considered and decided by STONEBURNER, Presiding Judge; LARKIN, Judge; and KLAPHAKE, Judge.*

**OPINION**

STONEBURNER, Judge.

Appellants and respondent are children of decedent (father). During his life, father funded five certificates of deposit (CDs) held jointly by father and respondent. As father aged and needed assistance, respondent became his primary caregiver. Approximately four months before father's death, respondent, at father's request, withdrew all funds from one of the CDs to repair the home in which father lived. Approximately three months before father's death, respondent, for reasons not explained in the record, withdrew all funds from the remaining CDs and placed them in an account in her name only. Father's will named respondent as personal representative and divided his estate equally among four of his children, including appellants and respondent. Appellants objected to respondent's failure to include funds withdrawn from the CDs in father's estate. After a hearing, the probate court denied the objections and approved respondent's final account and distribution, concluding that it was father's intent that the funds in the CDs belong to respondent without being included in his estate. We affirm.

**FACTS**

Decedent Ronald Earl Jones (father) had two children with his first wife: appellants Ronald H. Jones and Jessica Warren (objectors). He had three children with his second wife: Gale Bristlin, Diane Jones, and respondent Charlotte Larson.

Between 1987 and 2005, father funded five certificates of deposit held jointly with Larson. Father intended that the funds be used by Larson to care for her parents and her sister Diane Jones, who is handicapped and receives financial support from the state.[1]

Father's second wife predeceased father. As father aged, he became more and more dependent on Larson due to worsening medical conditions, including dementia. Larson provided transportation to medical appointments, kept track of father's medi-

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.
1. Father and Larson jointly held a sixth CD with Larson's son. This CD was funded by Larson, using funds she received as a gift from father. At the time this money was gifted to Larson, father made comparable gifts to Bristlin and objector Jones. On appeal, objectors are not pursuing a claim on behalf of the estate to the funds from this CD.

cations, set up automatic bill payments, took father to the tax preparer, cleaned father's home, and, when necessary, cooked for father.

In 2009, the city condemned father's home.[2] On December 18, 2009, Larson withdrew all of the funds from the largest CD (approximately $31,500). Larson testified that she used these funds to make the home habitable, at father's request, because he wanted to remain in the home until he died. Father continued to live in the home until he was hospitalized for surgery in early 2010. Following surgery, father entered a nursing home for rehabilitation.

On January 14, 2010, Larson withdrew all of the funds from the remaining CDs. Larson put these funds, in the approximate total amount of $24,180, into an account in her name only. Father died on April 5, 2010, at the age of 91.

Father's will appointed Larson as personal representative of his estate and divided his estate equally among objectors, Bristlin, and Larson.[3] Because the house had previously been conveyed to Larson and there were no funds on deposit in father's name, the estate consisted solely of some personal property. Larson had the property appraised and sold. After expenses, the net value of the estate was $3,486.80. Larson petitioned the probate court for approval of the final account and distribution of $871.70 per person to objectors, Bristlin, and herself. Objectors filed objections, asserting, in relevant part, that the funds from the CDs funded solely by father should be included in the estate.

Larson was the only witness to testify at the hearing. Her testimony established that, at the time she withdrew funds from the jointly held CDs, father did not have the capacity to make financial decisions due to his serious dementia.

Aside from Larson's testimony that father asked her to use some of the funds to make his home habitable, there is no direct evidence that father intended to gift the CD funds to Larson during his lifetime and no direct evidence that he did not intend for Larson to become the owner of the jointly held CDs at his death.

The probate court concluded that, under Minnesota law, during father's lifetime, the funds belonged to father as the sole contributor of the funds and Larson had no possessory interest or right to the funds. But the probate court noted that, had the funds not been withdrawn from the joint accounts, Larson would have been entitled to the funds on father's death. Noting that there is no Minnesota caselaw directly on point and therefore no guidance on the proper remedy for the circumstances in this case, the probate court relied on the following factors to conclude that the proper remedy was to deny the objections and allow the final account and distribution:

- [Father's will] does not refer to the CDs.

- From the evidence received at the hearing, there is no indication that [Larson] was involved in establishing the CDs and listing herself as joint owner. There is also no evidence of fraud, undue influence, or coercion [by Larson].

- [Father] gave $30,000 gifts to [Larson], [objector] Ronald H. Jones, and

---

2. Larson testified that, unbeknownst to her, father deeded the house to her in 1996. She testified that she did not learn of this conveyance until after father's death. No documents relating to the house are in the record.

3. Diane Jones was intentionally excluded from the will to protect her entitlement to state benefits.

Gale Bristlin, independent of the CDs he jointly held with [Larson].

- [Larson] was [father's] primary care-taker during the final years of his life.... [Father] instructed [Larson] to take money from [the largest CD] to fix up his home so he could preserve it from condemnation, and [Larson] did this.

- Objectors provided no evidence that [father] had a different intent with re-gard to the distribution of the funds in the CDs to [Larson] upon his death. If the funds were ordered returned to the estate, Objectors and Gale Bristlin would be enriched against the estab-lished intent of [father] in the jointly held CDs.

The probate court denied the objections and approved the final account and distri-bution. This appeal followed. ·

## ISSUE

Did the probate court err by determin-ing that, notwithstanding the destruction of any survivor-ownership presumption to jointly held funds created by Minn.Stat. § 524.6–204(a), the funds that Larson withdrew from the CDs before father's death were excluded from father's estate based on the probate court's finding that it was father's intent that the funds be be-long to Larson on his death without being included in his estate?

## ANALYSIS

■■■ This court reviews "a district court's probate decision to determine whether its findings are clearly erroneous and whether it erred in its legal conclu-sions." *In re Estate of Neuman*, 819 N.W.2d 211, 215 (Minn.App.2012). Ques-tions of "statutory interpretation and iden-tification of the applicable burden and standard of proof" are questions of law subject to de novo review. *Savig v. First*

*Nat'l Bank of Omaha*, 781 N.W.2d 335, 338 (Minn.2010). When interpreting a statute, this court aims to "ascertain and effectuate the intention of the legislature." Minn.Stat. § 645.16 (2012). "Where the legislature's intent is clearly discernible from plain and unambiguous language, statutory construction is neither necessary nor permitted," and this court applies the statute's plain meaning. *Am. Tower, L.P. v. City of Grant*, 636 N.W.2d 309, 312 (Minn.2001).

■■■ In controversies between parties of multiple-party accounts and "their cred-itors and other successors," Minnesota law provides:

> Sums remaining on deposit *at the death of a party to a joint account* belong to the surviving party or parties as against the estate of the decedent unless there is clear and convincing evidence of a different intention, or there is a differ-ent disposition made by a valid will as herein provided, specifically referring to such account.

Minn.Stat. §§ 524.6–202, .6–204(a) (2012) (emphasis added). But "[a] joint account belongs, *during the lifetime of all parties,* to the parties in proportion to the net contributions by each to the sums on de-posit, unless there is clear and convincing evidence of a different intent." Minn.Stat. § 524.6–203(a) (2012) (emphasis added). Under this provision, without evidence of a contrary intent, a joint account holder does not own "funds contributed by another party to the account" and "exercises do-minion over those funds only with the con-sent of the contributing party" during the contributing party's life. *Enright v. Leh-mann*, 735 N.W.2d 326, 335 (Minn.2007). If a joint account holder wrongfully with-draws such funds, the contributing party can bring an action to recover the funds. *Id.* Such an action survives the death of

the contributing party. *See Estate of Benson by Benson v. Minn. Bd. of Med. Practice,* 526 N.W.2d 634, 636 (Minn.App.1995) (stating that Minnesota law allows "claims for pecuniary losses to a decedent's estate to survive the death of the decedent").

The Minnesota Uniform Probate Code "shall be liberally construed and applied to promote the underlying purposes and policies." Minn.Stat. § 524.1–102(a) (2012). The purposes and policies of the code include "to discover and make effective the intent of a decedent in distribution of property." Minn.Stat. § 524.1–102(b)(2) (2012).

The probate court found, and the parties acknowledge, that under Minn.Stat. § 524.6–203(a), the funds in the jointly held CDs belonged to father during his life. And there is no dispute that, had the funds remained in the joint accounts, Larson would have owned the funds on father's death and the estate would have had no claim to the funds. Objectors argue that, because father was the sole owner of the funds in the CDs during his life, and because any presumption of Larson's ownership of the funds on father's death was destroyed when Larson withdrew the funds from the jointly held accounts prior to father's death, the funds must be included in father's estate.

## A. Father consented to Larson's withdrawal of funds to improve his home.

The probate court found that father instructed Larson to withdraw funds from a CD to preserve his residence from condemnation and that Larson followed this instruction. Objectors do not argue that this finding is clearly erroneous. Because Larson met her burden of showing that father consented to use of these funds to make his home habitable and that Larson used the funds as father intended, the probate court did not err by concluding that the estate has no claim to the funds that were in this CD. *See Enright,* 735 N.W.2d at 335 (acknowledging that a noncontributing joint account holder can exercise dominion over the jointly held funds with the consent of the contributing account holder).

## B. By withdrawing funds from the other CDs prior to father's death, Larson destroyed any presumption of ownership of those funds.

Funds in a joint account are presumptively owned by the survivor at the death of a joint owner. Minn.Stat. § 524.6–204(a). But in order for Larson to benefit from this statutory presumption, funds must have remained in the joint accounts until father died. *See id.* (applying presumption only to sums "remaining on deposit").

Objectors argue that, because no joint accounts existed at the time of father's death, the probate court erred by relying on the statutory presumption of survivor ownership, requiring them to show by clear and convincing evidence that father did not intend Larson to own the funds after his death. But the probate court did not base its decision on the statutory presumption of survivor ownership. The probate court recognized that Larson's action destroyed that presumption and that she had the burden to establish entitlement to the funds without the benefit of that presumption. The probate court did not erroneously impose an improper burden on objectors. Rather, the probate court, in an effort to "discover and make effective" father's intent in the distribution of his property, noted evidence that father intended Larson to have use of the funds and the absence of any evidence that father intended the funds to become part of the estate. *See* Minn.Stat. § 524.1–102(b)(2) (stating that one of the underly-

ing purposes of the probate code is "to discover and make effective the intent of a decedent in distribution of property"). There is no merit to the assertion that the probate court relied on the presumption of survivor ownership to exclude the funds from father's estate.

## C. The probate court did not err by distributing the challenged funds in a manner that effectuated father's intended distribution of property.

The probate code is to be liberally construed to promote its underlying purposes and policies, one of which is to effectuate the intent of the decedent. Minn.Stat. § 524.1–102 (2012). Noting the lack of caselaw in Minnesota precisely on point, the probate court evaluated the evidence and distributed father's property consistent with what the evidence showed to be father's intent. In doing so, the probate court did not violate any of the other policies and purposes of the act and reached a decision that is consistent with caselaw from other jurisdictions that have adopted the uniform act.

Although objectors cite two foreign cases with similar fact patterns as supporting their insistence that the plain language of Minn.Stat. § 524.6–203(a) and Minn. Stat. § 524.6–204(a) require inclusion of the disputed funds in father's estate, a close reading of those cases demonstrates that they are actually consistent with the probate court's remedy.

In *Shourek v. Stirling*, a contributing account holder's estate brought a conversion claim against a noncontributing account holder who withdrew funds from multiple joint accounts before the contributing account holder's death. 621 N.E.2d 1107, 1108 (Ind.1993). The Indiana Supreme Court reversed a trial court's grant of summary judgment in favor of the non-

contributing joint account holder. *Id.* at 1108, 1110–11. In doing so, the Indiana Supreme Court noted that the presumption of survivor ownership of the funds inherent in the joint account was not available to the noncontributing account holder and her co-defendant after the noncontributing account holder withdrew funds from the joint account, requiring them to "establish their entitlement to ownership without the benefit of such presumption." *Id.* at 1110. That court also rejected the noncontributing account holder's assertion that the contributing account holder's intent to transfer the funds to her during her lifetime was evidenced by the authority given to her to make withdrawals from the account during the contributing account holder's life. *Id.* The Indiana Supreme Court noted that "[t]he right to withdraw and the right of ownership ... are separate and distinct rights." *Id.* Because there was other evidence in the record that the contributing account holder intended to make a gift subject only to funds being available for her immediate needs and because the trial court had not considered that evidence or made findings on that issue, the Indiana Supreme Court remanded the case to the trial court "to weigh evidence and determine whether an inter vivos gift occurred." *Id. Shourek* is distinguishable because here the probate court found sufficient evidence, independent of the statutory survivor-ownership presumption, that father intended the funds to be distributed to Larson outside of probate, and the probate court fashioned a remedy that effectuated that intent.

In *Vaughn v. Bernhardt*, the South Carolina Supreme Court, citing *Shourek*, held that funds withdrawn from a joint account by a noncontributing account holder one week before the death of the contributing account holder belonged to decedent at the time of the withdrawal and became the

property of the estate on decedent's death. 345 S.C. 196, 547 S.E.2d 869, 869, 871 (2001). The South Carolina Supreme Court noted that its decision raised some policy concerns, stating: "While the Decedent may well have intended for [the noncontributing account holder] to receive the Joint Accounts' funds after her death, [the noncontributing account holder chose] to rely solely on the statutory presumption and did not present other evidence of intent." *Id.* at 871. Unlike the noncontributing account holder in *Vaughn,* Larson testified credibly that father gave her control over the joint accounts to care for her parents and her disabled sister. She also presented evidence that she was father's uncompensated primary caregiver, she provided care for her disabled sister, and father did not provide any compensation for her caretaking responsibilities through his will. The probate court found that there is no evidence of fraud, coercion, or undue influence by Larson as to the CDs, which are not mentioned in father's will. And the probate court found that there is no evidence that father intended anything other than that the funds belong to Larson on his death, such that including the funds in father's estate would enrich the objectors and Bristlin against father's established intent. Although the evidence in this case is minimal, the parties agree that there is no additional relevant evidence that would be developed on remand. We conclude that the record supports the probate court's findings of fact and that the findings of fact support the probate court's decision. On this record, the probate court did not err by distributing the challenged funds in a manner that effectuated father's intended distribution of property.

**D. Objectors failed to establish that Larson breached a fiduciary duty to father.**

Objectors argued to the probate court and on appeal that Larson should be re-quired to turn over the funds from the CDs to father's estate because she breached fiduciary duties owed to father. Neither Larson nor the probate court addressed this issue directly. But the probate court indirectly rejected this argument by finding that there is no evidence of fraud, coercion, or undue influence by Larson and no evidence that Larson used any of the funds for her own needs prior to father's death.

The cases relied on by objectors to support this argument are distinguishable. *Carlson v. Carlson* involved the question of whether joint accounts were validly created, which is a prerequisite to the presumption of joint ownership in such accounts. 363 N.W.2d 803, 805–06 (Minn.App.1985). Because a noncontributing adult child's name had been added to a mother's account without mother's knowledge, the case was remanded to the trial court for findings on whether mother authorized this adult child to act as her agent and, if so, the scope of that agency and whether the adult child had fulfilled his fiduciary duty as an agent. *Id.* at 806 (stating that if there was no authorized agency or if any fiduciary duty owed as an agent was breached, the transactions adding the name to the accounts must be set aside). But in this case it is undisputed that father set up the CDs jointly with Larson, and there is no evidence that Larson breached any fiduciary duty owed to father regarding the accounts. To the contrary, the evidence is undisputed that Larson used the funds as intended by father.

*In re Estate of Nordorf,* 364 N.W.2d 877 (Minn.App.1985), also involved the validity of the creation of a joint account. Noting that the "presumption of ownership by surviving parties to a joint account does not arise ... if the account was created

through the violation of a fiduciary duty," we affirmed the probate court's determination that funds in an account created through such a breach belonged to the estate of the decedent rather than to the fiduciary who contrived to have her name placed on the accounts. *Nordorf*, 364 N.W.2d at 879–80. Similarly, in *Hopper v. Rech*, we affirmed a probate court's holding that funds held in several multi-party accounts be included in the decedent's estate because clear and convincing evidence established that the decedent, contributor of the funds, did not intend that the appellant have survivorship rights. 375 N.W.2d 538, 541–43 (Minn.App.1985), *review denied* (Minn. Dec. 30, 1985). None of the cases cited supports objectors' argument that Larson is not entitled to the funds from the CDs that father created due to a breach of fiduciary duty, and we find no merit in objectors' claims based on breach of fiduciary duty.

## DECISION

The probate court did not err by excluding from father's estate funds removed by Larson during father's life from accounts she held jointly with him, notwithstanding the absence of any survivor-ownership presumption, because the evidence supports the probate court's finding that it was father's intent that these funds be distributed to Larson and not be included in his estate.

**Affirmed.**